IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| **ENERGY INTELLIGENCE GROUP, INC. and ENERGY INTELLIGENCE GROUP (UK) LIMITED,** | ) ) ) | CIVIL ACTION NO. 11-00428 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| **THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC,** | ) ) ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CONTI, Chief District Judge.

Pending before the court is a motion for partial summary judgment (ECF No. 61)[1] filed by plaintiffs Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited (collectively "EIG plaintiffs") and a motion for summary judgment (ECF No. 55) filed by defendant The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW" or "defendant").

After an extensive consideration of the parties' submissions and the applicable legal principles, the court concludes that in light of the summary judgment standard of review and based upon the evidence of record, EIG plaintiffs' motion for summary judgment is granted in

---

[1] The parties filed most documents under seal. The court cites to the document filed under seal, unless otherwise noted.

part with respect to the affirmative defense of equitable estoppel. Because there are genuine issues of material fact in dispute with respect to the other issues raised in the motions, the motions are denied in all other respects.

## I.  Procedural Background

EIG plaintiffs[2] initiated this action on March 31, 2011, by filing a complaint alleging copyright infringement against USW. (ECF No. 1). On January 30, 2012, EIG plaintiffs filed an amended complaint. (ECF No. 40.)

On September 10, 2012, EIG plaintiffs filed a motion for partial summary judgment and an accompanying brief (ECF Nos. 61, 62), and on September 11, 2012, filed a concise statement of material facts.  (ECF No. 63.)  On September 10, 2012, USW filed a motion for summary judgment, an accompanying brief, and a concise statement of material facts.  (ECF Nos. 55, 56 (redacted version of ECF No. 58), 57 (redacted version of ECF No. 59), 58, 59.)  On October 10, 2012, USW filed a brief in opposition to EIG plaintiffs' motion for partial summary judgment. (ECF Nos. 64, 65 (redacted version of ECF No. 66), 66.)  On that same date, EIG plaintiffs filed a brief in opposition to USW's motion for summary judgment.  (ECF No. 68.)  On October 24, 2012, USW filed a reply brief in support of its motion for summary judgment.  (ECF No. 77.)

On October 16, 2012, EIG plaintiffs filed a responsive concise statement of material facts.  (ECF No. 74)  On November 12, 2012, EIG plaintiffs filed a combined concise statement of material facts ("PCSMF").  (PCSF ECF No. 90.)  On November 12, 2012, defendants filed a combined concise statement of material facts ("DCSMF").  (DCSMF ECF No. 88.)

---

[2] The court refers to the plaintiffs collectively because the factual detail with respect to when a plaintiff should be referred to separately was not included in the record.

## II.    **Factual Background**

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

EIG plaintiffs and their predecessors-in-interest have published newsletters for the energy industry for over sixty-one years.  (PCSMF ECF No. 90 ¶ 3.)  Since 1951, EIG plaintiffs have published the daily newsletter *Oil Daily* (the "OD newsletter"), a publication that contains original content relating to the oil and gas industry.  (PCSMF ECF No. 90 ¶¶ 3, 4.)  EIG plaintiffs have an editorial staff of approximately fifty reporters, analysts, and editors, and editorial offices in New York, Washington, D.C., Houston, London, Moscow, Dubai, and Singapore.  (PCSMF ECF No. 90 ¶ 10.) USW is §501(c) nonprofit labor organization that provides collective bargaining services to its union members, with its principal place of business located in Pittsburgh, Pennsylvania.  (PCSMF ECF No. 90 ¶¶ 5, 61.)

In order for a person to receive the OD newsletter, he or she must purchase a subscription. (PCSMF ECF No. 90 ¶ 8.) EIG plaintiffs offer a variety of subscription options. (Id.)  Subscribers may obtain the newsletter by email or from EIG plaintiffs' website, with password protected access.  (PCSMF ECF No. 90 ¶ 11.)  Subscribers may also purchase individual articles or archived issues.  (PCSMF ECF No. 90 ¶ 18.)  On or about December 11, 1992, a predecessor-in-interest of USW began receiving a daily physical copy of the OD newsletter.  (DCSMF ECF No. 88 ¶ 1.)  At the time of USW's most recent renewal, the annual subscription fee for the OD newsletter was $2,350.  (PCSMF ECF 88 ¶ 3.)  USW paid its

subscription through February 20, 2012.  (PCSMF ECF 88 ¶ 3.)  USW's subscription to the OD newsletter continued daily until shortly after this lawsuit was filed.  (DCSMF ECF No. 88 ¶ 2.)

Originally and until December 1999, USW received a single paper copy of the OD newsletter via the mail.  (DCSMF ECF No. 88 ¶¶ 4, 11.)  On November 8, 1999, EIG plaintiffs sent a letter to all the OD newsletter subscribers to inform them that over the next couple of months, the OD newsletter would no longer be delivered in paper form and, instead, would only be available via electronic delivery, fax, or email.  (ECF No. 89 at 46.)  In early December 1999, USW's predecessor-in-interest's subscription to the OD newsletter was renewed with electronic delivery via daily email of the newsletter instead of USW receiving a paper copy.  (DCSMF ECF No. 88 ¶ 11.)  At the time of USW's renewal of its subscription in 1999, the annual subscription to the electronic version of the OD newsletter was $1,195.  (DCSMF ECF No. 88 ¶ 11.)

At all times relevant to this suit, the subscription of USW (and its predecessors-in-interest) to the OD newsletter was maintained by a subscription management company. (DCSMF ECF No. 88 ¶ 14.)  Until May 2003, the subscriptions were managed by Faxon/RoweCom.  (DCSMF ECF No. 88 ¶ 15.)  Starting in May 2003, EBSCO Information Services ("EBSCO") began managing the subscriptions.  (DCSMF ECF No. 88 ¶ 15.)  Invoices, subscription renewal notices, and terms and conditions relating to USW's subscription to the OD newsletter were sent to the relevant subscription management company, whether Faxon or EBSCO.  (PCSMF ECF No. 90 ¶ 26.)  The subscription management companies were agents of USW.  (DCSMF ECF No. 88 ¶ 14.)  EBSCO's "Customer Subscriber Inquiry" records regarding USW's subscription to the OD newsletter lists the recipient as "Reading Room – United Steelworkers," and the subscription type as "Institutional."  (DCSMF ECF No. 88 ¶ 16; ECF No. 89 at 69-70.)

This action concerns 2,880 distinct issues of the OD newsletter, which were authored by EIG plaintiffs between December 1999 and March 2011. (PCSMF ECF No. 90 ¶ 12.) EIG plaintiffs own valid United States copyright registrations for each of these 2,880 publications. (PCSMF ECF No. 90 ¶ 13.) EIG plaintiffs provide copyright notices on their website, articles, emails, and publications. (PCSMF ECF No. 90 ¶ 15.) From December 3, 1999 until approximately June 5, 2007, the copyright notice included in every issue of the OD newsletter read:

> Copyright © [YEAR] by Energy Intelligence Group, Inc. . . . Reproduction in any form is forbidden without written permission from the publisher, with the exception that authorization to photocopy items for internal or personal use, the internal or personal use of specific clients, and for training purposes other than classroom is granted by Energy Intelligence Group, Inc., provided that the appropriate fee is paid directly to Copyright Clearance Center.

(PCSMF ECF No. 90 ¶ 17; ECF No. 91-5 at 3.) Beginning around June 6, 2007, and continuing past the date USW's subscription ended, the copyright notice and warning included in all issues of the OD newsletter read:

> Copyright © [YEAR] by Energy Intelligence Group, Inc. . . . Access, distribution and reproduction are subject to the terms and conditions of the subscription agreement and/or license with EIG. Access, distribution, reproduction or electronic forwarding not specifically defined and authorized in a valid subscription agreement or license with EIG is willful copyright infringement. Additional copies of individual articles may be obtained using the pay-per-article feature offered at www.energyintel.com.

(PCSMF ECF No. 90 ¶ 18; ECF No. 91-5 at 6.)

Around June 6, 2007, EIG plaintiffs began printing a notice and warning under the title banner on the front cover of all issues of the OD newsletter which read, "Copyright © [YEAR]. Unauthorized access or electronic forwarding, even for internal use, is prohibited." (PCSMF ECF No. 90 ¶ 19; ECF No. 91-5 at 5.) EIG plaintiffs included copyright warnings on the covering emails that accompanied the OD newsletter when it was sent electronically, with

language similar to the following, "[r]eproduction in any form (photostatically, electronically or via facsimile), including via local- and wide-area networks, is strictly forbidden without direct licensed permission from EIG." (PCSMF ECF No. 90 ¶ 21; ECF No. 91-5 at 18.) On or around February 24, 2006, EIG plaintiffs sent a letter to all subscribers of their publications, including the OD newsletter, stating their policies regarding single-user subscriptions, including how subscriptions are intended only for the designated recipient and that the publications cannot be shared by multiple readers. (PCSMF ECF No. 90 ¶ 20; ECF No. 91-5 at 16.) The terms of use for single-user subscriptions were written on the reverse side of any invoices or renewal notices that were sent to the "[b]ill to" address listed in USW's records. (PCSMF ECF No. 90 ¶ 22.)

During the period of time relevant to this action, Mary Dimoff was employed by USW as a librarian and was the sole individual responsible for its subscriptions to the OD newsletter. (PCSMF ECF No. 90 ¶ 32.) Ms. Dimoff's job description included the responsibility to understand the costs associated with USW's subscriptions and to authorize renewals of those publications. (PCSMF ECF No. 90 ¶ 33.) Ms. Dimoff testified that there was nobody within USW charged with the responsibility of understanding the terms under which the publications to which USW subscribed were provided. (PCSMF ECF No. 90 ¶ 34.)

During the period when USW was receiving a paper copy of the OD newsletter, Ms. Dimoff maintained a list of USW recipients for the OD newsletter, and over the course of about three to four days, she routed the paper copy via the union's mailroom to approximately six to eight people within USW's offices in Nashville, Tennessee, after which it was returned to the library. (DCSMF ECF No. 88 ¶¶ 8, 9; PCSMF ECF No. 90 ¶ 30.) On or about December 3, 1999, USW's subscription to the OD newsletter was renewed with electronic delivery via a daily email. (DCSMF ECF No. 88 ¶ 11.) Ms. Dimoff began receiving daily emails of the OD

newsletter as an attached PDF to her email address. (ECF No. 88 ¶ 12). She continued her practice of sending the OD newsletter to her list of USW recipients, but started to send them by electronically forwarding the email with the attachment. (ECF No. 88 ¶ 13.) Ms. Dimoff would manually enter the email addresses associated with the people on her list who were to receive the forwarded OD newsletter, and then send the email. (PCSMF ECF No. 90 ¶ 38.) At some point, an auto-forwarding mechanism was put in place, and Ms. Dimoff no longer had to manually enter the email addresses of the recipients. (PCSMF ECF No. 90 ¶ 39.) Instead, the auto-forwarding mechanism would automatically forward the OD newsletter to a specific set of people when it arrived in Ms. Dimoff's email account. (PCSMF ECF No. 90 ¶ 39.) The earliest date that USW was able to locate documentation showing the electronic forwarding of the OD newsletter is June 6, 2006. (PCSMF ECF No. 90 ¶ 47.) This electronic forwarding continued until shortly after USW was served with the present complaint. (ECF No. 88 ¶ 2.)

Copies of the OD newsletter that were forwarded electronically on a daily basis were received by several employees of USW or USW's predecessors-in-interest, including but not limited to, Gary Beevers and Bruce Fickman. (PCSMF ECF No. 90 ¶ 42.) During the applicable period, Mr. Beevers held several positions with USW or USW's predecessors-in-interest, including vice president and regional director of Region 6, director of Region 13, and international vice president. (PCSMF ECF No. 90 ¶ 43.) Since about March 1, 2005, Mr. Fickman held the position of associate general counsel for USW or USW's predecessors-in-interest. (PCSMF ECF No. 90 ¶ 45.)

Ms. Dimoff reached out to EIG plaintiffs or subscription agents on several occasions. On February 8, 2007, Ms. Dimoff emailed EIG plaintiffs regarding a disruption in the delivery of the OD newsletter. (PCSMF ECF No. 90 ¶ 54; ECF No. 91-6 Pg. 85-86.) On February 27, 2007,

Ms. Dimoff contacted EIG plaintiffs via telephone to update the email address to which the OD newsletter was sent daily, from mdimoff@steelworkers-usw.org to mdimoff@usw.org. (PCSMF ECF No. 90 ¶ 55; ECF No. 91-6 at 88.) Deborah Brown, an employee of EIG plaintiffs, testified that usually when a customer requests a change to its account, it must be done via email, which did not happen this time. (ECF No. 89 at 130, 26:11-19.) "[U]nfortunately this was outside [EIG] company policy that day." (DCSMF ECF No. 88 ¶ 50; ECF No. 89 at 130, 27:11-13.)

On April 11, 2008, Ms. Dimoff emailed customer service at EIG plaintiffs ("April 2008 Email"). (DCSMF ECF No. 88 ¶ 25; April 2008 Email ECF No. 89 at 111-12.) In the April 2008 Email she asked, "I believe there are about six people who subscribe to this newsletter at the present time.…Can I add additional people to the account without being charged for it?" (April 2008 Email ECF No. 89 at 111-12.) Ms. Brown received the email and forwarded it to a number of people at EIG plaintiffs, including Thomas Wallin, EIG's chief executive officer, and Mark Hoff, an executive with EIG plaintiffs in a sales or marketing capacity. (DCSMF ECF No. 88 ¶ 29; April 2008 Email ECF No. 89 at 111-12. ECF No. 89 at 139.) In her forwarded email, Ms. Brown wrote, USW has "had a single email subscription to Oil Daily through EBSCO since December 1999.…[T]hey do not receive renewal notices or invoices which provide the copyright policy." (April 2008 Email ECF No. 89 at 111-12.) Ms. Brown noted, "Ms. Dimoff is indicating below [the] OD newsletter is currently being read by six (6) individuals and they would like to add another eight (8). As this is the only account for United Steelworkers, it is evident they are sharing." (April 2008 Email ECF No. 89 at 111-12.) Ms. Brown concluded the email by asking how she should handle Ms. Dimoff's request. (April 2008 Email ECF No. 89 at 111-12.) In her deposition from May 2, 2012, Ms. Brown noted that Ms. Dimoff was "literally telling us that she is already copyright infringing, which I feel is out of my realm to answer."

(DCSMF ECF No. 88 ¶ 28; ECF No. 89 at 133, 105:19-22.) After an internal discussion, EIG plaintiffs made a business decision to treat Ms. Dimoff's email as a business matter. (PCSMF ECF No. 90 ¶ 58.) Officials at EIG plaintiffs, including Mr. Wallin and Mark Wellman (EIG plaintiffs' intellectual property manager), concluded that Ms. Dimoff's request should be forwarded to the sales team. (April 2008 Email ECF No. 89 at 111-12.)

On April 21, 2009, Ms. Dimoff emailed Melanie Wlodyga, a customer service specialist with EBSCO, asking for copies of three past issues of the OD newsletter to be sent to USW employee John Vanjonack's email address jvanjonack@usw.org. (ECF No. 89 at 120.) Ms. Dimoff explained in her email that these three issues were from "the time when we had the problem of several days not getting to our people who receive it." (ECF No. 89 at 120.) Ms. Wlodyga responded that the publisher, EIG plaintiffs, would email the requested issues to the employee's email address. (ECF No. 89 at 120.)

On November 10, 2010, Ms. Dimoff emailed Ms. Wlodyga again ("November 2010 Email"), asking if two employees from USW could be removed from the subscription list for the OD newsletter. (PCSMF ECF No. 90 ¶ 59; November 2010 Email ECF No. 89 at 122-23.) Those two employees had retired from USW, and, therefore, Ms. Dimoff wanted them to stop receiving email copies of the OD newsletter. (November 2010 Email ECF No. 89 at 122-23.) Ms. Wlodyga responded later that same day that she called an EIG plaintiffs' employee, who told her the names would be removed from the list. (November 2010 Email ECF No. 89 at 122-23.) Gladys Infante, EIG plaintiffs' customer service representative, asked Ms. Wlodyga about the number of people who received the OD newsletter at USW, "to make sure we have the correct names on our list." (DCSMF ECF No. 88 ¶ 36; ECF No. 60 at 110-11.) Ms. Wlodyga emailed Ms. Dimoff again that day to ask for the list of names. (November 2010 Email ECF No.

89 at 122-23.) Ms. Dimoff responded with a list of fourteen names, including her own. (November 2010 Email ECF No. 89 at. 122-23.) Ms. Wlodyga forwarded that list to Ms. Infante. (ECF No. 60 at 110-11.) In the email from Ms. Wlodyga to Ms. Infante, Ms. Wlodyga referenced USW's customer name, which was listed as "Reading Room United Steelworkers." (ECF No. 60 at 110-11.) Ms. Infante never responded to USW or EBSCO's request regarding removing the two employees from the list of the OD newsletter recipients. (DCSMF ECF No. 88 ¶37; ECF No. 60 at 110-11.)

After the November 10, 2010 email exchanges among Ms. Dimoff, Ms. Wlodyga, and Ms. Infante, EIG plaintiffs assert they commenced an internal investigation, which resulted in the filing of this action on March 31, 2011. (PCSMF ECF No. 90 ¶ 60.)[3]

Prior to February 10, 2006, Deborah Brown, EIG plaintiffs' customer service representative, told Mr. Wellman, that a significant number of subscribers to publications received via PDF were received at generic email addresses such as library@company.com. (DCSMF ECF No. 88 ¶ 22.) USW's subscription, however, was at all times sent to Ms. Dimoff's email address. (DCSMF ECF No. 88 ¶ 22.) In his deposition, Mr. Wallin testified that EIG plaintiffs did not expect librarians to read the OD newsletter, but that the OD newsletter would be available for people to read at the library. (DCSMF ECF No. 88 ¶ 29; ECF No. 89 at 156, 67:19-24.) After the transition to electronic distribution, EIG plaintiffs observed that subscriptions to their publications were not keeping pace with their expectations. (DCSMF ECF No. 88 ¶ 38.) Mr. Wellman testified that electronic forwarding was the cause of declining revenues, and "we had to do something about it." (DCSMF ECF No. 88 ¶ 39; ECF No. 89 at 82, 45:13-15.) He testified that if electronic forwarding continued, EIG plaintiffs faced the

---

[3] USW disputes this claim, arguing EIG plaintiffs had already concluded at least as early as April 11, 2008, that USW was engaged in actionable copyright infringement. (ECF No. 81 ¶ 28.)

possibility of bankruptcy and "we were going to cease to exist and everybody who worked for us would be out on the street." (DCSMF ECF No. 88 ¶ 41; ECF No. 89 at 81-82, 44:23-24, 45:16-18.) Between June 2, 2005 and April 11, 2008, EIG plaintiffs commenced at least six copyright infringement actions against subscribers, alleging unauthorized electronic use of EIG plaintiffs' publications. (DCSMF ECF No. 88 ¶ 59.) Mr. Wellman testified that EIG plaintiffs' copyright policy was rewritten "so anybody with a third grade education could understand it." (DCSMF ECF No. 88 ¶ 67; ECF No. 89 at 91, 74:22-24.) EIG plaintiffs noted that despite rewriting their copyright notice in an effort to clarify its terms, "[s]ome clients may be unaware of the trouble caused by password sharing, email-forwarding or onward faxing/copying of our newsletters and reports." (DCSMF ECF No. 88 ¶ 68; ECF No. 89 at 160.) Mr. Wellman noted that it was not considered infringement if a subscriber "printed out one copy for the exclusive use and no other person had access to the electronic version." (DCSMF ECF No. 88 ¶ 69; ECF No. 89 at 137, 116:11-15.) He clarified that as long as a single copy was made, that copy could be circulated and viewed by other people. (DCSMF ECF No. 88 ¶ 69; ECF No. 89 at 137-38, 117:1-3.)

In 2006, EIG plaintiffs appointed Carlos Gamarra as their intellectual property/business manager, tasked with overseeing EIG plaintiffs' copyright protection efforts. (DCSMF ECF No. 88 ¶ 24.) His responsibilities included "monitoring client activity for possible infringement and … acting in a customer service role to help educate and interact with clients. (DCSMF ECF No. 88 ¶ 24; ECF No. 89 at 107.) Shortly after being assigned that position, Mr. Gamarra, however, was transferred to EIG plaintiffs' London office, and never took on the role. (DCSMF ECF No. 88 ¶ 24.) No successor was appointed to take his place. (DCSMF ECF No. 88 ¶ 24.)

In 2010, EIG plaintiffs began a policy of compensating their employees $5,000 in exchange for information about a subscriber's activity that resulted in a copyright infringement

complaint being filed against that subscriber. (DCSMF ECF No. 88 ¶ 60; ECF No. 89 at 160-62.) Pursuant to this policy, Ms. Infante received a $5,000 payment for reporting the information she received from Ms. Dimoff's November 10, 2010 email, which lead to this current lawsuit. (DCSMF ECF No. 88 ¶ 64.)

### III.    <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
>      **...**
>
> **(c) Procedures.**
>
> **(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produced admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

<u>Marten v. Godwin,</u> 499 F.3d 290, 295 (3d Cir. 2007) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>Doe v. Abington Friends Sch.</u>, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing <u>Celotex Corp.</u>, 477 U.S. at 322-23; <u>Anderson</u>, 477 U.S. at 248).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. <u>Doe v. Cnty. of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>see</u> <u>Woodside v. Sch. Dist. Of Phila. Bd. Of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

When the nonmoving party bears the burden of proof at trial, the moving party may discharge its burden by pointing out "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325. Once the moving party has made this

showing, the burden then shifts to the nonmoving party, who cannot simply rest on the allegations in the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec., 475 U.S. at 586. Summary judgment is proper in cases where the nonmoving party's evidence in opposition is "merely colorable" or "not significantly probative." Anderson, 477 U.S. at 249-50.

## IV. Discussion

EIG plaintiffs filed a motion for summary judgment on the issue of defendant's liability for copyright infringement requesting judgment in their favor on the affirmative defenses raised by USW (implied license, equitable estoppel, fair use, and laches) and that their damages are not limited to the three-year period prior to the commencement of this lawsuit. While USW does not contest EIG plaintiffs' ability to prove their prima facie case, USW seeks partial summary judgment with respect to two affirmative defenses—implied license and equitable estoppel—and to limit the amount of damages based upon the applicability of a three-year statute of limitations and lack of willfulness. The court will first address the affirmative defenses and next the issues with respect to damages.[4]

### A. Copyright Infringement Standard

To prove a claim of copyright infringement, the plaintiff must show (1) ownership of a valid copyright in the work, and (2) copying of the work by the defendant. Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1231 (3d Cir. 1986). EIG plaintiffs advanced evidence to show, and USW does not dispute, that EIG plaintiffs own valid United States copyrights in each of the OD newsletters that are relevant to this action. (PCSMF ECF No. 90 at

---

[4] EIG plaintiffs asserted that their claims are not barred by the lack of subject-matter jurisdiction for failure to register the copyrights. They offered undisputed evidence of duly issued copyright registrations for each publication. (ECF No. 91-2 at 3-55; ECF No. 91-3 at 1-38; ECF No. 91-4 at 1-50.) USW did not dispute the validity of the registrations or the court's subject-matter jurisdiction.

13.)  Specifically, 2,880 of the OD newsletters were created between December 1999 and March 2011, at which time USW's subscription to the OD newsletter terminated.  (PCSMF ECF No. 90 at 13; ECF No. 65 (redacted version of ECF No. 66) at 14; ECF No. 66 at 14; ECF No. 62 at 12.) With respect to the second requirement, USW does not dispute that it copied and distributed each of these issues of the OD newsletter.  (ECF No. 65 (redacted version of ECF No. 66) at 14; ECF No. 66 at 14.)  USW, however, asserts several affirmative defenses to infringement, each of which is discussed below.

**B.  USW's Affirmative Defenses to Copyright Infringement**

> **1)  Cross-motions on the affirmative defenses of implied license and equitable estoppel.**

The parties filed cross-motions for summary judgment on two of the affirmative defenses to copyright infringement raised by USW: 1) implied license, and 2) equitable estoppel.

> **a.  Implied License**

A court may find an implied license where the defendant's conduct would otherwise be infringing when a copyright holder's conduct manifests his intent to create an implied license. Estate of Hevia v. Portrio Corp., 602 F.3d 34, 41 (1st Cir. 2010).  The Court of Appeals for the Third Circuit has recognized that "a nonexclusive license may arise by implication where the creator of a work at a defendant's request 'hand[s] it over, intending that defendant copy and distribute it.'" MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 779 (3d Cir. 1991) (quoting Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990)). Other courts of appeals have described the factors a court must consider to determine whether an implied license exists as follows: (1) the licensee requests the creation of a work, (2) the licensor makes the particular work and gives it to the licensee, and (3) the licensor intends that the licensee copy and distribute his work. Beholder Prods. Inc. v. Catona, 629 F. Supp.2d 490, 494

(E.D. Pa. 2009) (noting "numerous other circuits" apply a "three-factor test" "to determine whether or not an implied license was granted") (citing Atkins v. Fischer, 331 F.3d 988, 991-92 (D.C. Cir. 2003); Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc., 128 F.3d 872, 879 (5th Cir. 1997); I.A.E., Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996)). Although 17 U.S.C. § 204 requires that "all transfers of copyright ownership, including transfers by exclusive license, must be in writing, a nonexclusive license is expressly removed from the scope of section 204 because a nonexclusive license does not amount to a 'transfer' of ownership." MacLean, 952 F.2d at 778.

### i. Conduct Prior to the April 11, 2008 Correspondence Between Mrs. Dimoff and EIG Plaintiffs

USW argues that the conduct of the parties shows that an implied license was created which allowed for USW's librarian to forward the OD newsletter to individuals within the organization. USW argues that EIG plaintiffs were aware that Ms. Dimoff was forwarding the publication to multiple people. To support its claim that EIG plaintiffs were aware of this behavior, USW points to: 1) a customer subscriber inquiry from November 2011, noting that the account was associated with a reading room (ECF No. 89 Pg. 69-70); and 2) EIG plaintiffs' knowledge that Ms. Dimoff, the named subscriber, was a librarian for USW. (DCSMF ECF No. 88 ¶ 5.) USW argues that based upon these facts EIG plaintiffs knew or should have known that the OD newsletter was being read by multiple individuals. USW argues that EIG plaintiffs had internal correspondence acknowledging that publications being sent to librarians "gave rise to suspicion of unauthorized electronic forwarding" and that Mr. Wellman, EIG plaintiffs' intellectual property manager, was aware that some librarians were transmitting infringing copies of the OD newsletter to other people in their organizations. (DCSMF ECF No. 88 ¶ 23.) USW notes that despite this acknowledgement, EIG plaintiffs made no effort to determine if USW was transmitting copies of the OD newsletter, or to inform USW that electronic forwarding of the OD

newsletter was not allowed.  USW argues that the only copyright policy it received regarding this publication was the copyright notice included on the OD newsletter, which stated that any "[u]nauthorized access or electronic forwarding…is prohibited."  (DCSMF ECF No. 88 ¶ 76.)  USW claims that this notice was not sufficient to prohibit electronic forwarding, due to the lack of clarification of the term "unauthorized."  (ECF No. 58 Pg. 17.)  EIG plaintiffs knew USW never received or acknowledged any terms or conditions with its subscription, but continued to renew USW's subscription.  Based upon this conduct and EIG plaintiffs' knowledge that some librarians were illegally forwarding copies of the OD newsletter, USW argues that EIG plaintiffs sent the publication to USW with the intent that USW copy and distribute it, just as it had been doing with the paper copy of the OD newsletter. "To hold otherwise would yield the absurd result where USW had paid thousands of dollars a year for over a decade for a subscription to a periodical that its employees were not even authorized to read."  (ECF No. 58 at 18.)

EIG plaintiffs, on the other hand, argue that there is no evidence to support a finding of an implied license.  EIG plaintiffs point to several matters in support of this argument: 1) EIG plaintiffs did not create the OD newsletter specifically at USW's request with the knowledge it would be used for the purpose of copying and distributing (ECF No. 68 at 12); 2) despite USW's claims, EIG plaintiffs were not aware that sending the OD newsletter to a library necessarily indicated an increased likelihood of infringement (ECF No. 68 at 13);[5]  3) the email address to which USW's subscription was sent (Mary Alyce Dimoff's email address) never indicated it was being sent to a library or reading room, so there was no notice of a library kind of usage provided

---

[5] EIG plaintiffs dispute the emphasis on Mr. Wellman's deposition testimony for this point, and note that Mr. Wellman used the word "might" twice in connection to his statement that librarians <u>might</u> transmit infringing copies of the publication.  (ECF No. 68 at 13.)

to EIG plaintiffs (ECF No. 68 at 13);[6] and 4) even if EIG plaintiffs' knew where the OD newsletter was being sent, Mr. Wallin and Mr. Wellman testified that when the subscription was being sent to a librarian or a reading room, the assumption was that the librarian would most likely print out a copy of the OD newsletter and place it on a shelf in the library for users to read. (ECF No 68 at 14.)

With respect to USW's motion for summary judgment on this issue, viewing the evidence of record in the light most favorable to the nonmoving party, a reasonable jury could find that EIG plaintiffs were not aware that USW's subscription was being sent to a librarian, and were not aware that librarians would necessarily be more likely to infringe on a copyright by forwarding copies. In addition, the Copyright Act, 17 U.S.C. § 101 et seq., does not recognize an obligation of copyright owners to discover whether anyone who receives a copy of the work is participating in infringing behavior. MacLean, 952 F.2d at 780.

On the other hand, with respect to EIG plaintiffs' cross-motion, a genuine question of material fact remains about whether EIG plaintiffs had actual or constructive knowledge of USW's infringing behavior prior to the April 2008 email. See the discussion on the statute of limitations, section C1 infra.

USW's argument—that its confusion regarding EIG plaintiffs' copyright policy lead to an implied license—is not sufficient as a matter of law to preclude a jury from rendering a verdict in EIG plaintiffs' favor. Although USW argued that it did not receive the terms and conditions of its license, the record shows that the terms were provided on multiple occasions to USW's subscription agents. (PCSMF ECF No. 90 ¶ 26.) "[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the

---

[6] Despite changes in the email address due to mergers of the USW and USW's predecessors-in-interest, the email address associated with USW's account always referred specifically to Mary Alyce Dimoff. (ECF No. 68 at 13.)

agent's duties to the principal." RESTATEMENT (THIRD) OF AGENCY § 5.03. The agency relationship between USW and its subscription management companies is clearly established on the record. (DCSMF ECF No. 88 ¶ 14.) Not all facts known to an agent, however, are automatically imputed to the principal. Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 106 (3d Cir. 2009). Two factors limit when knowledge is imputed to the principal: 1) the scope of the agent's duties to the principal, and 2) the significance of the facts in question to those duties. Id. Here, there is sufficient evidence for a reasonable jury to find that both factors could be met. USW hired the subscription agents to handle all its subscription accounts. Those agents would need to know about the kind of subscription, and the terms and conditions of the relevant license. The conditions of the relevant license could be material to the duties of the agent to USW. The court cannot find that the evidence as a matter of law shows USW was unaware of EIG plaintiffs' copyright policies because a reasonable jury may find the knowledge of USW's agent should be imputed to USW.

USW did not point to evidence of record sufficient for this court to find as a matter of law that EIG plaintiffs engaged in conduct from which USW could infer that EIG plaintiffs consented to USW copying and distributing the OD newsletter. On the other hand, a genuine question of material fact remains about whether EIG plaintiffs had notice of USW's infringing actions prior to April 2008. Therefore, neither EIG plaintiffs nor USW are entitled to summary judgment with respect to this defense.

### ii. Conduct After the April 11, 2008 Correspondence between Ms. Dimoff and EIG Plaintiffs

USW argues that any forwarding of the OD newsletter by Ms. Dimoff after April 11, 2008, was within the bounds of an implied license. On April 11, 2008, Ms. Dimoff sent an email to EIG plaintiffs' customer service (customerservice@energyintel.com) and stated that she

believed six people subscribed to the OD newsletter at that time. (ECF No. 89-1 at 191.) She inquired about how to add additional people to the account. (ECF No. 89-1 at 191.) Ms. Brown, a customer representative at EIG plaintiffs, forwarded this email to officials of EIF plaintiffs, including Mr. Wallin and Mr. Hoff. In Ms. Brown's email, she wrote: "As this is the only account for United Steelworkers, it is evident they are sharing." (ECF No. 89-1 at 193-94.) Mr. Wallin and Mr. Hoff decided this was an issue best taken up by the sales team. (ECF No. 89-1 at 193-94.) No salesperson followed up with USW. It is undisputed that following this email exchange, EIG plaintiffs had notice about USW's infringing behavior. (DCSMF ECF No. 88 ¶ 27.) USW argues because EIG plaintiffs knew about the infringing behavior and did not take any responsive action, EIG plaintiffs implicitly consented to defendant's use of the work.

USW alternatively argues that EIG plaintiffs' unwritten policy allowing users to print and circulate a single copy of the OD newsletter is an express unwritten license to use the OD newsletter outside the bounds of its written policy. Because of this implied license to distribute a physical copy, USW urges that this license should extend to electronic distribution as well. USW, however, offers no case law to support this conclusion or evidence showing that this was EIG plaintiffs' intent.

EIG plaintiffs argue that no implied license existed, even after April 11, 2008. After receiving the email giving notice, the management of EIG plaintiffs made a business decision at that time to have a salesperson follow up with USW. (DCSMF ECF No. 88, ¶¶ 51, 53.) In his deposition, Mr. Wellman testified that the decision to have a salesperson follow up was consistent with EIG plaintiffs' strategy of copyright enforcement at the time. (ECF No. 68 at 22.) Mr. Wellman testified: "If there was any justification for trying to handle it through salespeople, we should try that first." (ECF No. 89 at 95, 107:2-5.) EIG plaintiffs argue that its

management was not aware that a salesperson had not followed up with USW until November 10, 2010, when a second email was received from Ms. Dimoff through USW's subscription agent. (DCSMF ECF No. 88 ¶¶ 35-37.) EIG plaintiffs claim it was only then that management learned USW was continuing its infringing behavior, and decided to file a lawsuit.

With respect to USW's motion for summary judgment, viewing the disputed facts in the light most favorable to EIG plaintiffs, a reasonable jury could find that EIG plaintiffs made a business decision to allow a sales representative to follow up with USW, instead of filing an infringement lawsuit. USW did not point to evidence of record sufficient for this court to conclude as a matter of law that EIG plaintiffs engaged in conduct from which USW could infer that EIG plaintiffs consented to USW's copying and distributing the OD newsletter, even after April 11, 2008. USW is not, therefore, entitled to summary judgment based upon this defense with respect to actions taken after to April 11, 2008.

On the other hand, with respect to EIG plaintiffs' motion for summary judgment on this issue, a reasonable jury could find that EIG plaintiffs did not make an appropriate business decision to allow a sales representative to follow up with USW after they were aware of the infringing behavior on the part of USW. There was no evidence provided to show a salesperson actually reached out to USW after April 11, 2008. Instead, a reasonable jury might find that EIG plaintiffs knew about the infringing behavior, and sent the OD newsletter to USW with the intent that USW copy and distribute it. Because there are genuine disputes of material fact, summary judgment cannot be entered in favor of either party on this issue.

### b. Equitable Estoppel

There are four factors necessary to establish the affirmative defense of equitable estoppel: (1) the plaintiff has actual or constructive knowledge of the defendant's infringing conduct; (2)

the plaintiff must intend or expect that defendants will act on the plaintiff's misrepresentations or concealments; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury.  See Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960). The defense of equitable estoppel is available if the plaintiff assisted the defendant in the acts of infringement or induced or caused the defendant to perform the acts of infringement. Coleman v. ESPN, Inc., 764 F.Supp. 290, 295 (S.D.N.Y. 1991).  Causation is met "if there is express consent by the copyright owner or some statement that he does not regard defendant's acts as infringing or that he has no objection to defendant's work." Id. at 296.  Even without overt or obvious acts, silence and inaction can be sufficient to raise the defense of estoppel.  Carson v. Dynegy, Inc, 344 F.3d 446, 453 (5th Cir. 2003). The affixation of the copyright notice on copies of the work, if seen by the defendant, has been held sufficient to counter an estoppel based on silence and inaction.  See Hampton, 279 F.2d at 104.

In the instant case, USW argues that at minimum, there exist genuine disputes of material fact sufficient to preclude entry of summary judgment on this defense. For the first factor, requiring the plaintiff to have actual or constructive knowledge of the defendant's infringing conduct, Hampton, 279 F.2d at 104, USW reasserts the same argument it made with respect to the defense of an implied license. Prior to April 11, 2008, USW argues that EIG plaintiffs had constructive knowledge about USW's conduct based upon: 1) the words "library" or "reading room" on USW's subscriber information, and 2) EIG plaintiffs' expressed conviction that institutional subscribers and librarians were likely infringing EIG plaintiffs' copyright. (ECF No. 58 at 20.)  USW argues that after April 11, 2008, EIG plaintiffs had actual knowledge about electronic forwarding, when Ms. Dimoff emailed customer service at EIG plaintiffs to inquire about adding additional people to the account.

EIG plaintiffs argue that they did not have notice prior to April 11, 2008, because USW's subscription was always sent to Ms. Dimoff's specific email address, and not a generic library address. They claim that "common sense dictates[] their reasonable assumption…that a librarian would simply print out a single copy for use in the library, not that a librarian would electronically circulate multiple copies simultaneously across the country." (ECF No. 68 at 25.) EIG plaintiffs contend that USW mischaracterizes Mr. Wellman's testimony, and that he did not suspect librarians were more likely to infringe than any other subscriber. (ECF No. 74 ¶ 25.)

This evidence is not sufficient as a matter of law to find in favor of defendant. With respect to USW's motion, for the reasons discussed relating to the implied license defense, a reasonable jury could conclude that EIG plaintiffs did not have constructive knowledge about USW's conduct based upon the evidence of defendant's conduct prior to April 11, 2008. As previously discussed, there is sufficient evidence for a reasonable jury to find EIG plaintiffs had constructive knowledge about USW's conduct after Ms. Dimoff's April 11, 2008 email.

With respect to the second factor, the plaintiff must intend or expect that a defendant will act on the plaintiff's misrepresentations or concealments. Hampton, 279 F.2d at 104. USW contends EIG plaintiffs' silence and lack of inquiry into potentially infringing behavior show that EIG plaintiffs misrepresented their intent to enforce their copyright in the OD newsletter. USW argues that misrepresentation can occur by the plaintiff's silence and inaction, which may be sufficient to mislead and provide the basis for an estoppel. Id. A defendant, however, must use due care and engage in a "prudent course of conduct" by inquiring into the permissible use of the publication. Keane Dealer Servs., Inc. v. Harts, 968 F.Supp. 944, 948 (S.D.N.Y. 1997). USW argues because it did not receive effective notice of EIG plaintiffs' copyright policy, EIG plaintiffs were misleading USW with silence and inaction. USW asserts it exercised due care and

engaged in a prudent course of conduct by inquiring of EIG plaintiffs on April 11, 2008, and November 10, 2011, about whether it was authorized to forward electronically the OD newsletter. USW asserts that once EIG plaintiffs had notice about USW's infringing conduct, they not only remained silent, but affirmatively acted, by renewing USW's subscription annually, and by not properly answering either of Ms. Dimoff's email inquiries regarding whether she could add more people to its subscription. Instead, after the November 10, 2011 email, Ms. Infante inquired about the number of USW personnel who were receiving the OD newsletter "to make sure we have the correct names on our list." (DCSMF ECF No. 88 ¶ 63; ECF No. 89 at 125-26.) Finally, USW argues that EIG plaintiffs affirmatively acted by making the business decision to not inquire about their customer's potentially infringing behavior, unless the behavior was volunteered by a customer. Based upon this evidence, USW argues that EIG plaintiffs intentionally misrepresented and concealed their intent to enforce their copyright.

EIG plaintiffs argue that at no point was their copyright policy hidden from USW, and, therefore, they did not misrepresent or conceal their intent from USW. The court in <u>Hampton</u> found that simply affixing the copyright notice on copies of the work, in accordance with statutory requirements, provides ample notice to the defendant of the copyright holder's interest in the work, and counters an estoppel based upon a passive holding out. <u>Hampton</u>, 279 F.2d at 104. EIG plaintiffs provided copyright notice directly on the OD newsletter, and sent its terms and conditions to USW's subscription agent. In addition, EIG plaintiffs sent a letter to all subscribers describing their copyright policy in February 2006.

USW argues that it was unable to ascertain whether its actions were "unauthorized" under the copyright policy. This argument is flawed. Although USW did not directly receive a copy of EIG plaintiffs' terms and conditions, its subscription agent did. USW offers no

explanation about why it did not receive the terms and conditions from its subscription agent, or why it did not seek further clarification of its licensing agreement. Based upon factor two, the evidence of record is not sufficient for a reasonable jury to find in favor of USW. A reasonable jury could conclude that EIG plaintiffs did not misrepresent or conceal their intent to assert their copyrights because they affixed a copyright notice on every edition of the OD newsletter.

With respect to the third factor, USW argues that they innocently acted. Ms. Dimoff's April 11, 2008 email along with her testimony shows that she thought her subscription allowed for multiple recipients of the OD newsletter. (DCSMF ECF No. 88 ¶ 25.) She reached out to USW's subscription agent, EBSCO, on April 21, 2009, to inquire about obtaining back issues for a USW employee. She was told by the agent that EIG plaintiffs would be emailing those three requested issues, and was never told USW had a single user subscription. In addition, Ms. Dimoff reached out on two occasions to inquire about changing the subscription to allow for more users, and again, no notice was given to her that USW's subscription did not allow for multiple users. (DCSMF ECF No. 88 ¶¶ 25, 35.) Based upon this evidence, USW argues Ms. Dimoff and USW were acting innocently and were ignorant of the fact that USW's behavior was infringing.

EIG plaintiffs argue that it was USW's own actions that kept it blind of warnings and notices that should have made it apparent its conduct was infringing. As noted under the second factor, EIG plaintiffs provided a copyright notice directly on the OD newsletter and sent its terms and conditions to USW's subscription agent. EIG plaintiffs also sent a letter to all subscribers describing their copyright policy in February 2006. If USW found the copyright notice insufficient, it should have taken affirmative steps to clarify the copyright policy.

The evidence with respect to this third factor is not sufficient for a reasonable jury to find in favor of USW. A reasonable jury could conclude that USW was not acting innocently because it did not follow up with its subscription agent or with EIG plaintiffs to confirm if its actions were permissible.

The fourth factor requires the defendant to rely on the copyright holder's conduct to its detriment. <u>Hampton</u>, 279 F.2d at 104. USW argues that EIG plaintiffs were aware of USW's infringing behavior as early as April 11, 2008, yet remained silent and renewed USW's subscription. USW notes that almost three years of liability and damages amassed during that time, and if EIG plaintiffs had responded to Ms. Dimoff's inquiries, and explained that its behavior was infringing, USW would have stopped forwarding the OD newsletter.

EIG plaintiffs, however, provided copyright notice directly on the OD newsletter, and sent their terms and conditions to USW's subscription agent. EIG plaintiffs' conduct under the circumstances could not be found by a reasonable jury to contain misrepresentations or concealments. Therefore, USW could not rely on EIG plaintiffs' conduct to it detriment. For that reason, with respect to the fourth factor, the evidence is not sufficient for a reasonable jury to find in favor of USW.

"[E]stoppel is a drastic remedy and must be utilized sparingly." <u>Keane Dealer Servs.</u>, 968 F.Supp. at 948. To assert successfully this remedy, a party must "use due care and not fail to inquire as to its rights where that would be the prudent course of conduct." <u>Id</u>. Here, no reasonable jury could find USW properly inquired about its rights regarding forwarding the publication to additional users. USW did not offer sufficient evidence to support its argument that EIG plaintiffs concealed or misrepresented any material facts regarding USW's subscription to the OD newsletter. In addition, USW did not offer sufficient evidence to show that EIG

plaintiffs intended USW to rely on any misrepresentation. Although EIG plaintiffs were aware of USW's infringing behavior after April 11, 2008, and thus the first factor is met, at least with respect to behavior that occurred after that date, USW did not provide sufficient evidence to meet the other three factors necessary for a reasonable jury to render a verdict in its favor on the defense of equitable estoppel. For these reasons, EIG plaintiffs' motion for summary judgment that its claims are not barred by equitable estoppel as a matter of law will be granted and USW's motion for summary judgment on this issue will be denied.

### 2. USW's Other Affirmative Defenses to Copyright Infringement

EIG plaintiffs seek summary judgment on USW's two other affirmative defenses to copyright infringement: 1) the doctrine of fair use and 2) laches.

### a. The Doctrine of Fair Use

In determining whether a use of a work is fair, the factors courts consider include: "(1) the purpose and character of the use, including whether the use is commercial in nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. These factors are not exhaustive, and should not be treated in isolation from each other. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579-80 (1994). The more transformative the work is from the original, the less significant the other factors will be, and it is more likely that a finding of fair use will be made. Id. at 580.

With respect to the first factor, the purpose and character of the use, USW argues that determining whether a use was commercial or noncommercial requires considering whether there was a nonprofit purpose for the use. See 17 U.S.C. § 107(1). USW contends that because

USW is a nonprofit labor union, it cannot derive any commercial benefit from its use of the OD newsletter. USW argues that the OD newsletter was used to educate USW employees about the oil industry and to aid in USW's collective bargaining efforts for its union members. It notes that even if USW derived financial benefit from the use of the OD newsletter, that benefit is secondary to its primary purpose of educating USW's employees. In support of its argument, USW cites a decision issued by the Second Circuit Court of Appeals, in which the court held that internal reproductions of publications by Texaco were not a commercial use for the purposes of fair use, because the publications were not tied to Texaco's profits, revenues, and commercial performance. Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 921-22 (2d Cir. 1994). USW contends that it acted innocently, and was unaware that its forwarding was unauthorized.

EIG plaintiffs argue that there is no evidence to show that USW's use was anything other than commercial in nature. They note that USW's act of forwarding the OD newsletter was done for the same purpose that EIG plaintiffs publish the OD newsletter, namely to distribute copies to those interested in reading it. In addition, there was no transformation of the OD newsletter, because USW copied and distributed the entire issue.

With respect to the second factor, the nature of the work, the Supreme Court has found that creative expression is entitled to more protection than more factual works. See Campbell, 510 U.S. at 586-87 (contrasting fictional short stories with factual works, soon-to-be-published memoir with published speech, motion pictures with news broadcasts, and creative works with bare factual compilation). USW argues that the OD newsletter is largely factual in nature, because it includes heavily fact-based articles, as well as public announcements and news. Because the content is factual in nature, USW argues that this factor weighs in favor of USW. EIG plaintiffs argue that they invested significant time and resources to create the OD newsletter.

They point to their staffs of fifty reporters, editors, and analysts, who are located at seven different offices throughout the world. EIG plaintiffs use the skill and expertise of these authors and editors to present information about the oil industry in a creative manner.

The third factor is the amount of the work copied. USW notes that although entire issues of the OD newsletter were electronically forwarded, the Supreme Court has found an exception when a use "merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge." Sony Corp. of Am. v. Universal City Studios, 464 U.S. 417, 449 (1984). USW argues that its employees already had the right to view each of the issues, albeit through a different method of distribution. EIG plaintiffs agreed that the OD newsletter could have been printed once and circulated in hard copy to one employee at a time. USW argues that this factor is not particularly relevant because the infringing behavior was caused by technological means, not an intentional act. It relies upon William Patry, Patry on Fair Use § 5:3 (2013 ed.), for the proposition that reproductions from "caching and other ephemeral conduct" lessen the importance of the third factor. EIG plaintiffs argue that USW copied the entire OD newsletter, and, for this reason, this factor cannot weigh in favor of USW.

The fourth factor is the effect of the use upon the potential market for the copyrighted work. USW argues that the weight of this factor is limited when the market harm alleged by EIG plaintiffs is the loss of additional license fees, as it is here. See Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 614 (2d Cir. 2006). USW argues that EIG plaintiffs did not suffer a loss of potential licensing fees here because they acknowledged that USW was authorized to distribute a hard copy of the OD newsletter through intra-office mail. (DCSMF ECF No. 88 ¶¶ 69, 71.) If USW distributed the OD newsletter by that method, no additional licenses would need to be purchased.

EIG plaintiffs argue that it is appropriate for potential licensing fees to be considered in this fourth factor analysis when there is a viable market for licensing the copyrighted work. See Am. Geophysical Union, 60 F.3d at 930. They note the Supreme Court has found that when a use amounts to duplication of the entire original, it obviously supersedes the original and acts as a market replacement for the original, which makes it likely that an identifiable market harm to the original will occur. Campbell, 510 U.S. at 591. EIG plaintiffs' business is the sale of subscriptions to their publications. (PCSMF ECF No. 90 ¶ 11.) For that reason, EIG plaintiffs argue that USW's actions superseded and served as a market replacement for the original OD newsletter.

A fair use analysis is a fact-sensitive analysis of the four factors. These factors are not exhaustive and should not be treated in isolation. Campbell, 510 U.S. at 580. Consideration of the evidence adduced with respect to these factors shows there are genuine issues of material fact that must be resolved by a jury. The purpose and character of the use by USW is unclear. It argues that as a union, it used the work for nonprofit educational purposes, but there were commercial uses as well. The evidence with respect to the second factor, the nature of the work, is not clear. EIG plaintiffs expend significant time and manpower creating the OD newsletter, using fifty reporters, editors, and analysts. On the other hand, the articles in the OD newsletter are substantially factual in nature. With respect to the third factor, the amount of work used, USW admits to copying entire issues of the OD newsletter. The fourth factor appears to weigh in favor of USW, because USW argues that if it was aware of its infringing behavior, it would have reverted to the previous method of distribution, via intra-office mail, and would not have purchased additional licenses. It is clear, however, that EIG plaintiffs' business is built solely around the sale of subscriptions. USW by forwarding copies of the OD newsletter instead of

licensing the right to forward was hurting the potential market for the original publication. Because a fair use analysis is generally fact sensitive, and is so in this case, and there are genuine issues of material fact summary judgment cannot be granted in favor EIG plaintiffs on this issue.

### b. Laches

A party asserting laches as an affirmative defense must show 1) an unreasonable delay in bringing the action, and 2) prejudice. <u>United States Fire Ins. Co. v. Asbestospray, Inc.</u>, 182 F.3d 201, 208 (3d Cir. 1999). "In determining reasonableness, courts look to the cause of the delay." <u>Danjaq LLC v. Sony Corp.</u>, 263 F.3d 942, 954 (9th Cir. 1981). "Courts have recognized two chief forms of prejudice in the laches context—evidentiary and expectations-based." <u>Id</u>. at 955. Evidentiary prejudice includes lost or degraded evidence. <u>Id</u>. Expectations-based prejudice is demonstrated by showing that the defendant took actions or suffered consequences that it would not have, had the plaintiff promptly brought suit. <u>Id</u>.

USW reiterates that the evidence discussed below with respect to the statute of limitations issue and the evidence discussed above with respect to the defense of equitable estoppel make it clear that EIG plaintiffs' delay in bringing the present action was inexcusable and caused USW to suffer prejudice. USW argues that because EIG plaintiffs had actual or constructive knowledge about USW's infringing behavior prior to the statute of limitations period, there is a presumption that USW was prejudiced by EIG plaintiffs' delay in bringing the action. Alternatively, USW asserts, even if it is determined that EIG plaintiffs did not have knowledge outside the statute of limitations period, laches may still be found if the delay is sufficiently unreasonable and the prejudice is sufficiently inequitable. USW urges that because EIG plaintiffs "specifically failed to answer USW's good faith inquiries as to the scope of its subscription, and affirmatively renewed USW's subscription," which allowed USW to continue

its infringing conduct, EIG plaintiffs' delay is unreasonable. (DCSMF ECF No. 88 ¶¶ 25-28, 35-37, 51-57.) USW asserts that it was prejudiced by EIG plaintiffs' delay because USW continued to receive the OD newsletter, continued to accumulate potential damages by forwarding the OD newsletter, and affirmatively renewed its subscription to the OD newsletter.

EIG plaintiffs repeat their arguments discussed below with respect to the statute of limitations, and argue that they filed the current action in a timely fashion after discovering USW's infringement. They note that Ms. Dimoff's April 11, 2008 email was treated as a sales matter, and they at that point had not decided to pursue legal action. Finally, EIG plaintiffs assert that USW suffered no prejudice, because any delay that may have existed did not cause USW to be disadvantaged in asserting any claimed right or defense. See U.S. Fire Ins. Co., 182 F.3d at 208.

The Court of Appeals for the Third Circuit has held that the Copyright Act does not recognize a never ending obligation for a copyright holder to discover whether anyone to whom he gave his work would copy it. MacLean, 952 F.2d at 780. A genuine question of material fact remains about whether EIG plaintiffs' business decision to treat the April 2008 email as a sales decision was reasonable. Based upon this court's conclusion with respect to the statute of limitations defense, see section C1 infra, there is a genuine dispute of material fact about EIG plaintiffs' actual or constructive knowledge. A jury will need to determine if EIG plaintiffs delayed in bringing this suit. Granting summary judgment on this issue in favor of EIG plaintiffs' is, therefore, not appropriate.

## C. Damages

USW moves for summary judgment to limit EIG plaintiffs' recoverable damages, based upon the statute of limitations and alternatively on the issue of statutory damages and

willfulness. EIG plaintiffs filed a cross-motion arguing that their damages are not limited to the three-year period prior to the filing of this suit. Each argument is discussed below.

### 1. Statute of Limitations

The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). In cases like this case where infringement is continuing over a period of time, "'[e]ach act of infringement is a distinct harm giving rise to an independent claim for relief.'" William A. Graham Co. v. Haughey, 568 F.3d 425, 433 (3d Cir. 2009) (quoting Stone v. Williams, 970 F.2d 1043, 1049 (2d Cir. 1992)). In this case, EIG plaintiffs seek damages for acts of infringement, i.e., forwarding the electronic copy of the OD newsletter, which occurred more than three years prior to the commencement of this lawsuit. EIG plaintiffs assert they did not discover the infringing conduct until at the earliest April 2008, and under the discovery rule the statute of limitations for the infringing conduct prior to that time did not being to run until the discovery occurred. Because not all occurrences of infringement are immediately discoverable, the Third Circuit Court of Appeals has held that the discovery rule should be applied in determining when the limitations period begins to run. See Haughey, 568 F.3d at 436-37. Under this rule, a claim begins to accrue when the copyright holder discovers, or with due diligence should have discovered, the injury that is the basis for the claim. Id at 438.

To determine when a party should have discovered infringing activity, courts consider whether there is evidence of possible wrongdoing to put them on inquiry notice or to "excite 'storm warnings' of culpable activity." Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006) (quoting In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325 (3d Cir. 2002)). The defendant bears the burden of showing these storm

warnings, and the burden then shifts to the plaintiff to show it exercised reasonable due diligence, but was unable to discover injuries.  Id.

USW again argues EIG plaintiffs knew or should have known prior to March 31, 2008, that Mary Dimoff was electronically forwarding the OD newsletter, which exceeded the scope of USW's subscription.  USW points to the same evidence described above with respect to the affirmative defenses of implied license and equitable estoppel to show evidence of storm warnings.  See sections B1a and B2b supra.  In addition, USW asserts that EIG plaintiffs initiated at least six copyright infringement actions against other customers, between June 2, 2005 and April 11, 2008, all of whom were engaging in substantially similar behavior to that of USW. (ECF No. 65 (redacted version of ECF No. 66) at 16; ECF No. 66 at 16.)  USW asserts EIG plaintiffs had a policy to not make any inquiries about customers' uses of the OD newsletter unless information about electronic forwarding or sharing was offered by a customer. (ECF No. 66 at 16.)[7]  USW argues that EIG plaintiffs' "policy cannot justify tolling the statute of limitations because it does not comport with the equitable principles of the discovery rule, which is designed to protect only reasonably diligent plaintiffs." (ECF No. 65 (redacted version of ECF No. 66) at 17; ECF No. 66 at 17.) USW asserts EIG plaintiffs' passive no-inquiry policy is unreasonable and fell short of due diligence. USW is not satisfied with EIG plaintiffs' revision of its copyright policy and notices. USW argues that the revision was insufficient to provide notice of infringing behavior because the policy did not clarify that USW was a single user.

EIG plaintiffs argue that they did not have notice of USW's infringing acts.  The only correspondence they directly had with USW was the April 11, 2008 email from Ms. Dimoff. EIG plaintiffs argue that even if the court finds this email constitutes notice, the statute of

---

[7] The court cites to the sealed document only here because this argument was redacted in the redacted version. (ECF No. 65.)

limitations would begin to run on that date. EIG plaintiffs filed the initial complaint in the present action on March 31, 2011, which is within three years of April 11, 2008.

EIG plaintiffs contend that their initiation of copyright lawsuits against other subscribers prior to the discovery of USW's infringing conduct does not constitute storm warnings. In William A. Graham Co. v. Haughey, the Third Circuit Court of Appeals held that the storm warnings must be specific to the defendant, and that the copyright owner's notice that a third party has the copyrighted material and may find it useful to copy does not by itself constitute a storm warning. Haughey, 568 F.3d at 440.

A genuine dispute of material fact remains about whether EIG plaintiffs had actual or constructive knowledge of USW's infringing behavior prior to April 11, 2008. Neither side has met its burden of proof on this issue. Summary judgment on this issue cannot be granted in favor of either party.

### 2. Statutory Damages and Willfulness

The Copyright Act allows for a copyright owner to elect to seek damages in the form of either: 1) actual damages and any additional profits of the infringer; or 2) statutory damages. 17 U.S.C. §504(a). Statutory damages may be awarded "with respect to any one work, … in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). In addition, if the infringement is found to have been willful on the part of the defendant, the amount of statutory damages may be increased, up to $150,000 per work, at the discretion of the court. 17 U.S.C. §504(c)(2). To prove willfulness, the plaintiff must show that the defendant knew that his actions constituted copyright infringement, or that the defendant acted with reckless disregard or willful blindness to the copyright holder's rights. Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005). The defendant need

not maliciously act. <u>Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.</u>, 807 F.2d 1110, 1115 (2d Cir. 1986). The Second Circuit Court of Appeals has held that "in the absence of evidence conclusively demonstrating actual, rather than constructive, knowledge of infringement…summary judgment on the question of willfulness" is inappropriate. <u>Island Software</u>, 413 F.3d at 258.

USW seeks summary judgment in its favor on the issue of willfulness. It contends that it had a reasonable and good faith belief that the actions of Ms. Dimoff, in forwarding the email to additional recipients, were within the scope of its paid subscription. It argues that Ms. Dimoff was unaware that her conduct was a violation of EIG plaintiffs' copyright terms, because EIG plaintiffs never provided USW with the terms. Ms. Dimoff's 2008 and 2010 emails requesting to add recipients establish her reasonable and good faith belief that USW's subscription allowed her to forward the OD newsletter to a specific number of additional people. USW also contends that once EIG plaintiffs were made aware of Ms. Dimoff's actions, EIG plaintiffs decided not to explain the proper subscription policy to USW and, instead, allowed USW to continue to renew its subscription and its infringing behavior. USW argues that a reasonable subscriber would conclude that its conduct was not objectionable to EIG plaintiffs, because EIG plaintiffs were made aware of the conduct at least as early as 2008, and followed up with Ms. Dimoff's 2010 email by inquiring about the number of people receiving the OD newsletter, to "make sure we have the correct names on our list" instead of informing her about the subscription terms. (ECF No. 58 at 28.) USW argues that because it never received a notice or a warning from EIG plaintiffs, it had no reason to believe that what it was doing constituted infringement of EIG plaintiffs' copyright.

EIG plaintiffs argue that USW acted with knowledge that its actions constituted infringement, or at the very least, with reckless disregard to EIG plaintiffs' rights. EIG plaintiffs argue that Ms. Dimoff, as USW's librarian, and the sole person responsible for USW's subscription, should be required to be familiar with the terms and conditions for those subscriptions, and with copyright principles in general. Alternatively, EIG plaintiffs suggest that many of the people to whom Ms. Dimoff was forwarding the OD newsletter should have been aware that USW's actions were infringing, because the publication included a copyright notice on its cover. USW's associate counsel and an international vice president were recipients of the forwarded publication, and were responsible for the publication of one of USW's periodicals and should, therefore, have been aware of the possibility that Ms. Dimoff's conduct was impermissible. (ECF No. 68 at 34.) EIG plaintiffs argue that it was USW's obligation to determine what actions were permitted by its subscription, and that the two emails sent by Ms. Dimoff, over the course of the eleven years, are not sufficient to support USW's argument that it acted reasonably and in good faith to determine whether or not its actions were permitted under its subscription.

The Third Circuit Court of Appeals has recognized that "issues of knowledge and intent are particularly inappropriate for summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of parties." Riehl v. Travelers Ins. Co., 772 F.2d 19, 24 (3d Cir. 1985). Here, there is no evidence that conclusively demonstrates USW had actual knowledge of infringing behavior. In addition, a reasonable jury could find that Ms. Dimoff's email correspondence regarding USW's subscription, and the responses from EIG plaintiffs, were sufficient to satisfy the requirement that USW acted reasonably and in good faith to determine whether its actions were permitted. EIG plaintiffs' argument that USW should have

been aware its behavior was infringing because USW's associate counsel and an international vice president were receiving the forwarded OD newsletter is not conclusive. EIG plaintiffs presented no evidence to show that either person had knowledge of the license agreement between EIG plaintiffs and USW.

On the other hand, it is not unreasonable for a jury to find Ms. Dimoff, as the sole person responsible for USW's subscriptions, was aware or should have been aware of the licensing agreement for the OD newsletter. A reasonable jury could find that USW did not satisfy the good faith requirement to determine whether its actions were permitted because Ms. Dimoff only reached out to EIG plaintiffs a handful of times regarding the subscription. In addition, EIG plaintiffs posted a copyright notice on every issue of the OD newsletter. If USW found the notice to be unclear, a reasonable jury could conclude that it was USW's responsibility to follow up with EIG plaintiffs to clarify the notice.

For these reasons, there is a genuine dispute of material fact with respect to whether USW's infringement was willful. Summary judgment on this issue in favor of USW is, therefore, not appropriate.

## V.     Conclusion

Because genuine disputes of material fact remain with respect to several affirmative defenses offered by USW, summary judgment in favor of EIG plaintiffs or USW on the issue of USW's liability for copyright infringement is not appropriate at this time. EIG plaintiffs' motion for summary judgment with respect to the issue of defendant's affirmative defense of equitable estoppel, however, must be granted because USW failed to adduce sufficient evidence for a reasonable jury to render a verdict on that issue in its favor. For the same reason, USW's motion for partial summary judgment on the defense of equitable estoppel must be denied. The evidence

adduced was such that no reasonable jury could render a verdict in favor of USW on the issue of equitable estoppel. The motions for summary judgment and partial summary judgment in all other respects must be denied. An appropriate order will be entered.


Dated: August 29, 2013                                    By the court,

                                                          /s/ Joy Flowers Conti
                                                          Joy Flowers Conti
                                                          United States Chief District Judge